**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KENYA LASHAWN DANIELS | ) | CASE NO. 5:25-CV-02019 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | CARMEN E. HENDERSON |
| | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| Defendant, | ) | |

## I. Introduction

Kenya Daniels ("Daniels" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 7). For the reasons set forth below, the Court OVERRULES Claimant's Statement of Errors and AFFIRMS the Commissioner's decision.

## II. Procedural History

On June 7, 2023, Daniels filed applications for DIB and SSI, alleging a disability onset date of January 1, 2018 and claiming she was disabled due to neuropathy, crippling of feet and toes, PTSD, anxiety, and depression. (ECF No. 8, PageID #: 286–295, 347). The applications were denied initially and upon reconsideration, and Daniels requested a hearing before an administrative law judge ("ALJ"). (ECF No. 8, PageID #: 152–55, 173–78, 181–84). On October 28, 2024, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational

1

expert testified.  (ECF No.  8, PageID #: 88–120). On November 8, 2024, the ALJ issued a written decision finding Daniels was not disabled. (ECF No. 8, PageID #: 65–82). The ALJ's decision became final on July 28, 2025, when the Appeals Council declined further review. (ECF No.  8, PageID #: 34).

On September 23, 2025, Daniels filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1.) The parties have completed briefing in this case. (ECF Nos. 10, 11, 12). Daniels asserts the following assignment of error:

(1) Whether the ALJ Erred by Failing to Include Work-Related Limitations Consistent with the Opinions of E.M. Bard, Ph.D., Ermias Seleshi, M.D., and Ken Lovko, Ph.D.

(ECF No. 10 at 15).

## III. Background

### A.  Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Daniels's hearing:

> The claimant reported that she experienced pain in her legs and feet that interfered with her ability to walk and climb stairs. She reported that she could not walk more than twenty yards before needing to rest. The clamant alleged that her left hammer toes interfered with her gait due to having limited gripping with the left foot. She testified that her right foot toe range of motion was limited. She required the use of crutches, a cane, or the use of holding onto objects to walk. The claimant stated that her pain symptoms also interfered with her ability to stand. The claimant testified that her footwear options were limited. The claimant alleged that her impairments limited her ability to kneel, squat, and lift objects. The claimant testified that she could not lift heavy objects. The claimant stated that she had problems with her memory. She required reminders to take her medication. The claimant indicated that she could not pay attention for long periods. She alleged that she tolerated stress and changes in routine poorly. The claimant reported that due to her mental and physical limitations, she rarely left her home. She claimed that she was easily irritated and upset. The claimant testified that she engaged in altercations with family. (citation omitted).

(ECF No. 8, PageID #: 72).

**B. Relevant Medical Evidence**

The ALJ also summarized Daniels's health records and symptoms:

In March 2018 and April 2018, the claimant sought treatment for bilateral pain in her feet. The claimant described the pain as worst in the balls of her feet and radiating into her toes. The claimant also described experiencing neuropathy pain in her feet. (1F/3, 8, 11). Upon examination, the claimant's feet were tender. The claimant's nails were dystrophic. She had hammer toes. The claimant's feet had decreased epicritic sensations and no protective sensation. However, the claimant's sensation to light touch was intact. The claimant's feet and ankles retained full range of motion. The claimant's strength was intact at 5/5 bilaterally. The claimant's pain symptoms were treated with Gabapentin. (1F/4, 9).

The claimant continued to experience pain in her feet bilaterally with excessive callus development and hammer toes in June 2018. Upon examination, the claimant was found to have constant contractures and pain in her toes. Her feet were tender. The claimant had a right foot bunion. (1F/13).

When treated in November 2020, the claimant complained of pain in her feet due to bunions and idiopathic neuropathy despite treatment with Gabapentin. (7F/121). Despite her complaints, when examined, the claimant walked with a normal gait. The claimant's coordination was normal. (7F/122). The following month, the claimant continued to complain of bilateral foot pain related to bunions, hammertoes, and calluses. She alleged that her pain could rise to 10/10 levels. Upon examination, the claimant had bony prominence on the medial aspect of the first metatarsal and bilateral toe contractures. The claimant's first metatarsals had effusion bilaterally. The claimant's ankle joint range of motion was limited, but her SJ, and MTJ joint range of motion was intact bilaterally. Her protective sensation was decreased. Despite these symptoms, the claimant's muscle strength was intact at 5/5 bilaterally. The claimant's sensation to light touch was intact bilaterally. (7F/119).

In December 2020, the claimant underwent an x-ray of her feet which found decreased joint spaces on the right 1st MTP, medial eminence noted to the 1st metatarsal bilaterally. Elevatus of the first metatarsal was noted. The claimant had digital contracture was observed to the second and third digits at the PIP joint. (7F/183). Nevertheless, an examination performed in January 2021 found that the claimant walked with a normal gait. The claimant's strength and sensation were intact. (7F/116).

The claimant underwent an arterial pulse volume recording of both lower extremities in July 2021. The results found that the claimant's pressures were only mildly dampened in her toes. The claimant's thigh, calf, ankle, and transmetatarsal pressures were normal. (7F/171-178). the claimant had bony prominence on the

3

medial aspect of the first metatarsal and bilateral toe contractures. The claimant's first metatarsals had effusion bilaterally. The claimant's ankle joint range of motion was limited, but her SJ, and MTJ joint range of motion was intact bilaterally. Her protective sensation was decreased. Despite these symptoms, the claimant's muscle strength was intact at 5/5 bilaterally. The claimant's sensation to light touch was intact bilaterally. (7F/106).

In June 2022 through October 2022, the claimant walked with an antalgic gait. The claimant's feet had hyperkeratotic lesions. The claimant had a c-shaped lateral aspect of both feet with medial deviation of the metatarsals in the transverse plane with plantar lateral prominence of the tuberosity of the fifth metatarsal base. The hallux of both feet had lateral drift which impinged upon the second digit. The hallux exhibited valgus rotation. There were hyperflexion contractures at the 2, 3, 4, and 5 PIP joints bilaterally. However, the claimant's epicritic sensation was intact and within normal limits. The claimant retained normal range of motion in her ankles. The claimant was treated conservatively with orthotics and debridement of her calluses. (3F; 6F/35, 45, 56).

The claimant sought treatment for right foot pain in September 2022. A September 2022 x-ray of her right foot found no acute osseous injuries. The claimant had no fractures or subluxations. (7F/165). The claimant's right foot was swollen, but retained full range of motion. The claimant's reflexes were normal. (7F/62). In December 2022, the claimant's arches were high with bunions and calluses. Her feet were tender bilaterally. There was no evidence of edema in her feet. (6F/31).

When treated in February 2023, the claimant's motor strength was intact. The claimant walked with a normal gait. (7F/29-32). In March 2023, the claimant's ankles and toes retained full range of motion despite bilateral bunions, calluses and pain symptoms. (6F/22).

In April 2023, the claimant's feet had deep-seated porokeratotic lesions to multiple toes. The claimant's nails had severe dystrophy. The claimant's right foot hallux had a valgus deformity. She displayed flexible hammertoe contractures in multiple toes. Nevertheless, the claimant's strength was intact in her left ankle, left foot, and toes. The claimant retained full range of motion. (5F/2-3, 18-19). Imaging of the claimant's left foot found evidence of arthritic changes to the midfoot region of the left foot. The claimant's imaging was consistent with her examination findings. (5F/3).

A May 2023 examination found that the claimant had bilateral bunions and high arches. Nevertheless, the claimant's feet showed no signs of swelling. The claimant's ankle range of motion was full. The claimant retained 5/5 strength in her feet and ankles. (5F/21; 6F/16). In June 2023, the claimant's strength and sensation were intact. The claimant's cognition and motor skills were normal. The claimant's ankle range of motion was intact. The claimant's extremities showed no signs of swelling or tenderness. The claimant walked with a normal gait. (6F/10; 7F/22).

4

In July 2023, the claimant underwent a bunionectomy with distal metatarsal osteotomy, correction to the right foot second digit and second metatarsal, and excision of the fifth metatarsal head of the right foot. (7F/14-19, 150-152). When examined in August 2023, the claimant's surgical site was well healed. The claimant's surgical correction was maintained. (5F/5, 16; 15F/9).

The claimant reported experiencing foot pain despite surgical treatment in September 2023 and October 2023. The claimant reported experiencing gait problems. The claimant alleged that she experienced weakness and numbness in her feet. (11F/16, 19). When examined, the claimant's right foot range of motion was limited. Nevertheless, the claimant's sensation was intact. The claimant's surgical site was well healed. The claimant was treated with Lyrica and Naproxen. (11F/17). The claimant's right foot corrections were maintained. Imaging of the claimant's right foot found that her surgical hardware was stable. (15F/15).

In December 2023, the claimant reported that she experienced severe pain in her legs and feet. The claimant alleged that she had problems wearing shoes. However, the claimant also reported that her right foot pain and functioning had improved after undergoing her surgical procedures.

When examined, the claimant's feet and ankles retained 5/5 strength and normal range of motion. (15F/18).

February 2024 imaging of the claimant's left hand found degenerative narrowing of the interphalangeal joints. (11F/30; 16F/289). Imaging of the claimant's hip found subcortical cystic changes of he left femoral head. (11F/28). When examined, the claimant's right hand middle finger was swollen with pain on range of motion due to an acute fracture. The claimant's left hip was also tender. Nevertheless, the claimant's hip range of motion was full. The claimant's sensation was intact. (11F/7, 11).

When examined in March 2024, the claimant's strength was intact at 5/5 bilaterally. (12F/25). A nerve conduction study performed in March 2024 produced normal results. (12F/40-41). In April 2024, the claimant's low back was tender with limited range of motion was limited. The claimant's low back produced muscle spasms. Nevertheless, the claimant's lower extremity strength was intact at 5/5 bilaterally. Her reflexes were 2+. The claimant's sensation was intact. (12F/9-10).

In August 2024, the claimant's left foot continued to have hammertoe contractures causing pain and excess callus formation. However, the claimant's right foot surgical site was well healed. The claimant's correction was well maintained. (12F).

As for the claimant's mental health, the claimant attended treatment for her mental health in November 2020. The claimant reported that she had previously been treated with Cymbalta but was unable to tolerate it. (7F/121). When examined, the

claimant's mood was normal. She was treated with a prescription for Amitriptyline. (7F/123). In May 2021, the claimant's medication regimen was amended to include Buspar. (7F/112).

In June 2021, the claimant attended another treatment session for her mental health. The claimant endorsed experiencing anxiety and panic attacks despite taking medication as prescribed. The claimant also reported experiencing depressive symptoms. She indicated that she was stressed and overwhelmed while taking care of her grandchildren. (7F/107). Despite the claimant's complaints, the claimant's mood was normal during treatment. There was no evidence of impaired cognitive functioning. Her medication regimen was amended to include Wellbutrin. (7F/109).

The claimant underwent a mental health assessment in January 2022. The claimant reported feeling depressed and anxious with diminished pleasure in activities, decreased appetite, insomnia, hypersomnia, psychomotor agitation, fatigue, feelings of worthlessness, inappropriate feelings of guild, indecisiveness, nervousness, anxiousness, and panic attacks. The claimant endorsed prior hospitalizations due to suicidal ideation. The examiner noted that the claimant expressed paranoid and social phobia related thought content. She reported having compulsions to clean. The claimant displayed signs of mania with an inflated self-esteem. Her speech was verbose and pressured with flights of ideas. The claimant's attention as limited and she was easily drawn to unimportant or irrelevant items. Nevertheless, the claimant's judgment and insight were intact. The claimant's memory was good. (7F/97-101). The claimant continued to be treated with Amitriptyline, and Buspar. She also took Hydroxyzine. The claimant was treated further with individual therapy. (7F/96).

In March 2022, the claimant's condition appeared to improve. The claimant reported experiencing decreased anxiety. Upon examination, the claimant's mood was euthymic with a full affect. The claimant displayed appropriate behavior and appeared for treatment well dressed and well groomed. The claimant's insight and judgment were appropriate. The claimant's associations were intact and linear. There was no evidence of impairments to memory or concentration. (7F/93-94).

The claimant's mood was anxious in April 2022. Her affect was sad, tearful, and reactive. Nevertheless, the claimant's demeanor and motor activity were appropriate. The claimant was cooperative with the treatment provider. The claimant appeared for treatment appropriately groomed and casually dressed. The claimant's thought processes were circumstantial, but her associations were normal. The claimant's thought content included hopeless themes, but also include future goals and plans. The claimant's memory, attention, concentration, and language skills were all intact. The claimant's perceptions were normal. The claimant's Buspar was discontinued and replaced with Escitalopram (7F/88, 91).

In May 2022 the claimant reported significant anxiety. (7F/75, 78). When treated in June 2022, the claimant's mood was sad. The claimant was fidgety, anxious,

nervous, and irritable. She endorsed increased social isolation due to her physical and mental impairments. However, the claimant's associations were intact and linear. The claimant's insight and judgment were appropriate. The claimant's thought processes were free of suicidal and homicidal ideation. The claimant continued to be treated with therapy. (7F/65, 72). Later in the same month, the claimant's symptoms improved. While she was depressed and anxious, the claimant's demeanor was appropriate, and she was cooperative with the treatment provider. She was appropriately groomed and casually dressed. The claimant's insight and judgment were fair. (7F/69).

When treated in September 2022 in October 2022, the claimant's mood was euthymic with a full affect. The claimant's insight and judgment were appropriate. The claimant's thought content was circumstantial and disorganized, but free of suicidal and homicidal ideation. She was distractible. The claimant's associations were intact and linear. The claimant's behavior was appropriate. The claimant was well dressed and well groomed. The claimant's medication regimen was amended to include Prozac. (7F/57, 59, 64). The claimant continued to complain of anxiety and depression with only some mitigation with the use of medication. The claimant's functioning was stable. (7F/47-49).

In January 2023, the claimant was anxious and sad. The claimant's thought processes were circumstantial and disorganized. She displayed issues with attention and concentration. However, the claimant displayed appropriate behavior during treatment. She appeared for treatment appropriately dressed and groomed. The claimant's associations were intact and linear. Her insight and judgment were fair. (7F/42-43, 46).

As part of her application, the claimant participated in a psychological consultative examination. The claimant reported that she was depressed with anhedonia and social withdrawal. The claimant reported that she could be verbally aggressive. The claimant endorsed experiencing daily crying spells. She described being anxious in crowds. During the examination, the claimant was irritable and unhappy with an overwhelmed, depressed affect. The claimant was potentially delusional due to her believe that a blood transfusion caused the conditions in her feet and that she was adopted. The claimant endorsed experiencing paranoid thoughts. The claimant displayed perseverate thinking as she regularly focused on her foot conditions. The claimant had difficulty performing the serial sevens task and made multiple errors. The claimant could not recall her social security number backward. However, the claimant could spell the word "world' backwards. The claimant was able to recall seven digits forward and four digits backward. The claimant's estimated IQ was 90. (10F).

The claimant did not receive dedicated mental health care treatment in 2024. Her treatment consisted of medications form her medical treatment providers. In February 2024, the claimant presented with a depressed affect. However, the claimant was fully oriented. The claimant's thought content was normal. (16F/357).

In July 2024, her mood, behavior, thought content, and judgment, were all normal. (16F/39).

(ECF No. 8, PageID #: 72–77).

### C. Opinion Evidence at Issue

#### 1. Psychological Consultative Examiner, E.M. Bard, Ph.D.

On February 14, 2024, Dr. Bard completed a psychological consultative examination. (ECF No. 8, PageID #: 869–76). In his psychological evaluation, Dr. Bard found that Claimant was substandard in her ability to sustain concentration and persistence in work related activities at a reasonable pace. (*Id.* at PageID #: 875.) Additionally, Dr. Bard opined, "[Claimant] did not appear to have any significant problem in carrying out or remembering one or two step directions." (*Id.*). Finally, Dr. Bard found that Claimant was substandard in her ability to deal with normal pressures in a competitive work setting. (*Id.*) Specifically, "[Claimant's] perseveration [related to her foot injury] in a work-related atmosphere would be detrimental and most likely disturbing other nearby employees." (*Id.*)

#### 2. State Agency Medical Consultants, Ermias Seleshi, M.D. and Ken Lovko, Ph.D.

On March 5, 2024, Dr. Seleshi opined that Claimant could understand and remember simple one to two step instructions for routine tasks; perform familiar routine tasks without expectation for fast pace, close concentration or meeting stringent production standards; engage in superficial interactions with coworkers, supervisors, and the general public, and adapt to work in a stable and flexible setting with predictable expectations and infrequent routine change, but would perform best in solitary duties without over the shoulder supervision. (ECF No. 8, PageID#: 137–38). Upon reconsideration, Dr. Lovoko affirmed Dr. Seleshi's previous limitations. (*Id.* at PageID #: 154–55).

8

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3. The claimant has the following severe impairments: Osteoarthritis, Peripheral Neuropathy, Hammer Toes, Status-Post Right Foot Bunionectomy, Personality Disorder, Depressive Disorder, Anxiety Disorder, Somatic Symptom Disorder, and Post-Traumatic Stress Disorder. (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds. The claimant can occasionally stoop, kneel, crouch, and crawl. The claimant can follow simple instructions and work-related decisions, but not at a production rate pace. The claimant can occasionally interact with others. The claimant can tolerate occasional changes in a routine work setting.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2018, through the date of this decision (20 CFR 404.1520(g) and 416.920(g))

(ECF No. 8, PageID #: 68, 69, 71, 81, 82).

## V. Law & Analysis

### A.  Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a

9

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (en banc)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## B.  Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529

(6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C.  Discussion

Daniels raises the following assignment of error on appeal: "Whether the ALJ Erred by Failing to Include Work-Related Limitations Consistent with the Opinions of E.M. Bard, Ph.D., Ermias Seleshi, M.D., and Ken Lovko, Ph.D." (ECF No. 10 at 15).

To support this argument, Daniels asserts,

> Substantial evidence does not support the ALJ's step five findings because the opinions of the consultative examiner and both state agency medical experts are inconsistent with the ALJ's RFC, despite being found persuasive by the ALJ. Tr. 44-45. SSR 83-10; SSR 85-15; SSR 85-16; see also 20 C.F.R. § 404.1520c. The ALJ did not provide legally sufficient reasons for implicitly rejecting the limitations found in Dr. Bard, Dr. Seleshi, and Dr. Lovko's reports. See SSR 96-8p.

(ECF No. 10 at 15–16). Claimant also takes the position that "the ALJ failed to make a logical bridge between the persuasive opinion evidences [sic.] to the ultimate RFC finding." (ECF No. 12 at 1).

In response, the Commissioner argues that "[t]he ALJ reviewed the entire record and reasonably concluded that Plaintiff could follow simple instructions and work-related decisions, but not at a production rate pace; occasionally interact with others; and tolerate occasional changes in a routine work setting." (ECF No. 11 at 5). The Commissioner then contends that the ALJ relied upon substantial evidence in formulating the RFC. (*Id.*) This Court agrees with the Commissioner for the reasons set forth below.

11

**1. The ALJ Did Not Err in his Failure to Explain Why the Solidary Duties Limitation was not included in the RFC.**

At Step Four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e). For claims filed after March 27, 2017, such as this one, the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." C.F.R. § 404.1520c(a). Still, an ALJ must "articulate how [she] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. 20 C.F.R. § 404.1520c(a). Medical source opinions are evaluated using the factors listed in 20 C.F.R. § 404.1520c(c). Thus, the ALJ must "articulate how [he/she] considered the medical opinions and how persuasive [he/she] find[s] all of the medical opinions." *Ryan L.F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1)) (internal citations omitted). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

Relying on SSR 96-8p: Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), Claimant argues that the ALJ failed to adequately explain his decision not to adopt Dr. Bard's opinion that "[Claimant] does not appear to have any significant problem in carrying out or remembering one or two step directions" and "[Claimant's] perseveration [related to her foot injury] in a work-related atmosphere would be detrimental and most likely disturbing other nearby employees" despite finding the opinion persuasive. (ECF No. 8 PageID #: 77, 875) (ECF No. 10 at 16); SSR 96-8p, Narrative Discussion Requirements. Claimant also argues that the ALJ failed to adequately explain his decision not to adopt Dr. Seleshi and Dr. Lovko's opinions that Claimant "would perform best in solitary duties

12

without over the shoulder supervision" as well as "could understand and remember simple one to two step instructions for routine tasks" articulated by the state agency medical consultants despite finding the opinions persuasive. (ECF No. 8 PageID #: 78) (ECF No. 10 at 16). Under SSR 96-8p, if the RFC conflicts with a medical opinion, the ALJ must explain why the medical opinion was not adopted. SSR 96-8p, Narrative Discussion Requirements.

The Commissioner points out that the solidary duties limitation that Claimant cites from Dr. Seleshi and Dr. Lovko merely observe that Claimant "would perform best" with this limitation. (ECF No. 8, PageID #: 78) (ECF No. 11 at 6). However, the ALJ was not required to create an optimal work setting for Claimant. *Horinek v. Saul*, 2020 WL 4340987, at *9 (N.D. Ohio July 7, 2020), *report and recommendation adopted,* 2020 WL 4339327 (N.D. Ohio July 28, 2020) (internal citations omitted). "The RFC only needed to assess the necessary conditions for [Claimant] to work—not [Claimant's] ideal or optimal work environment that would give her the greatest chance for success." *Id.* Moreover, optimal work conditions, however, are not necessary ones. The RFC "is the most you can still do despite your limitations." *Jakubiak v. Berryhill*, 337 F. Supp. 3d 80, 85–86 (D. Mass. 2018) (citing 20 C.F.R. 416.945(a)(1)) (internal citations omitted); *see also Gonzales v. Colvin*, 213 F. Supp. 3d 1326, 1331 (D. Colo. 2016) ("Identifying the optimal work environment for a claimant does not mean that his RFC is limited to that work setting alone."). Dr. Bard's statement that Claimant "*would perform best* in solitary duties without over the shoulder supervision" describes an optimal working condition rather than a necessary one. (ECF No. 8 PageID #: 78) (emphasis added); *see, e.g.*, *Horinek*, 2020 WL 4340987, at *9 (finding medical opinion indicating the plaintiff "*would benefit*" or "*be best suited*" in a particular work environment are optimal conditions not necessary conditions) (emphasis added); *Peacock v. Kijakazi*, 2021 WL 4477863, at *11 (N.D. Ohio Sept. 30, 2021)

13

(finding medical opinion indicating the plaintiff "*would have a better chance* of job success …

under lose supervision" an optimal condition not a necessary condition) (emphasis added). As a

result, this Court finds no error in the ALJ's failure to explain why the solidary duties limitation

was not included in the RFC.

> **2. The ALJ Properly Evaluated the Medical Opinions building an Accurate and Logical Bridge between the Record Evidence, Medical Opinions, and the Resulting RFC.**

Turning to the remaining limitations, the ALJ built a logical bridge between the record

evidence, Dr. Bard's, Dr. Seleshi's, and Dr. Lovko's medical opinions and the following

limitations: (1) "[Claimant] does not appear to have any significant problem in carrying out or

remembering one or two step directions," (2) "[Claimant's] perseveration [related to her foot

injury] in a work-related atmosphere would be detrimental and most likely disturbing other nearby

employees," and (3) Claimant could understand and remember simple one to two step instructions

for routine tasks. (ECF No. 8 PageID #: 77–78). Yet Claimant repeatedly contends that the ALJ

erred by omitting these limitations from the RFC, or at least that he erred in failing to explain the

omissions. (ECF No. 10, at 16). However, the ALJ built a logical bridge between the record and

the RFC, supported by substantial evidence and will not be disturbed by this Court.

Moreover, while an ALJ must consider all the evidence in the record when making a

disability determination, he is not required to address all of it in his written decision. *Kornecky v.

Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Additionally, the RFC determination

need not be an exact copy of the relevant medical opinions. *Poe v. Comm'r of Soc. Sec.*, 342 F.

App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)) (stating that

the ALJ "is not required to recite the medical opinion of a physician verbatim in [the] residual

functional capacity finding"); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th

Cir. 2015) (citation omitted) ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a [reviewer's] opinions verbatim; nor is the ALJ required to adopt the [reviewer's] limitations wholesale."). Furthermore, the ALJ is not required to incorporate all of the medical opinion's limitations because he found the medical opinion persuasive. *Nasser v. Comm'r of Soc. Sec.,* 598 F. Supp. 3d 614 (E.D. Mich. 2022), *aff'd*, No. 22-1293, 2022 WL 17348838 (6th Cir. Dec. 1, 2022); *see also Borger v. Comm'r of Soc. Sec.,* 2021 WL 6297536, at *9 (N.D. Ohio Dec. 17, 2021) ("But an ALJ need not adopt all opined limitations, even if he finds the opinion persuasive."). Therefore, although the ALJ found Dr. Bard's, Dr. Seleshi's, and Dr. Lovko's opinions persuasive, he was not required to include all of their limitations in the RFC or "explain why he did not adopt all of [the] limitations." *Hedick v. Berryhill*, 2018 WL 6348759, *6 (N.D. Ohio Nov. 14, 2018), *report and recommendation adopted by* 2018 WL 6344611 (N.D. Ohio Dec. 4, 2018).

   i.    **The ALJ's evaluation of Dr. Bard's, Dr. Seleshi's, and Dr. Lovko's is Supported by Substantial Evidence.**

Moreover, substantial evidence supports the ALJ's evaluation of the one to two step task limitation. (ECF No. 8, PageID #: 71). As a preliminary matter, the Court notes that Dr. Bard's psychological evaluation concluded that Claimant "*did not appear* to have any significant problems in carrying out or remembering one to two step directions. The claimant *might have* some difficulty with complex or technical instructions." (ECF No. 8, PageID #: 77) (emphasis added). This conclusion does not definitively state Claimant *could only* perform one or two step instructions. Rather, Dr. Bard is suggesting Claimant might have difficulties with complex or technical instructions but does not provide a specific limit. And Dr. Seleshi's and Dr. Lovko's evaluations found that "claimant *could* understand and remember simple one to two step instructions for routine tasks." (ECF No. 8, PageID #: 78) (emphasis added). Again, this conclusion

15

does not definitively state that Claimant could *only* perform one or two step instructions. *See Knapp v. Comm'r of Soc. Sec.*, 2019 WL 2714755 (N.D. Ohio June 28, 2019).

In his psychological evaluation, Dr. Bard found that Claimant was substandard in her ability to sustain concentration and persistence in work related activities at a reasonable pace. (*Id.* at PageID #: 875.) Additionally, Dr. Bard opined, "[Claimant] did not appear to have any significant problem in carrying out or remembering one or two step directions." (*Id.*) Finally, Dr. Bard found that Claimant was substandard in her ability to deal with normal pressures in a competitive work setting. (*Id.*) Specifically, "[Claimant's] perseveration [related to her foot injury] in a work-related atmosphere would be detrimental and most likely disturbing other nearby employees." (*Id.*)

> In his discussion of Dr. Bard's opinion, the ALJ stated:
>
> The psychological consultative examiner opined that the claimant did not appear to have any significant problems in carrying out or remembering one to two step directions. The claimant might have some difficulty with complex or technical instructions. The claimant's ability to sustain concentration and persistence work related activities at a reasonable pace was substandard. The claimant's performance in dealing with normal pressures in a competitive work setting was substandard. (10F). I find this opinion to be persuasive. It was supported by the claimant's performance during the examination. The claimant performed poorly on test batteries meant to assess her concentration and memory. The claimant's thought processes were perseverative, focusing on her foot condition and pain. (10F). The opinion was also consistent with the record. The claimant was periodically distracted, with circumstantial thought processes and unusual thought content. The claimant could be irritable, anxious, and depressed. (7F; 16F).

(ECF No. 8, PageID #: 77). Here, the ALJ's RFC incorporated many of Dr. Bard's opinions by limiting Claimant to "simple instructions and work-related decisions, but not at a production rate pace" with occasional interactions with others and occasional changes in a routine work setting. (ECF No. 8, PageID #: 71).

16

Moreover, State agency psychological physicians, Dr. Seleshi and Dr. Lovko opined that Claimant could understand and remember simple one to two step instructions for routine tasks; perform familiar routine tasks without expectation for fast pace, close concentration or meeting stringent production standards; engage in superficial interactions with coworkers, supervisors, and the general public, and adapt to work in a stable and flexible setting with predictable expectations and infrequent routine change, but would perform best in solitary duties without over the shoulder supervision. (ECF No. 8, PageID#: 137–38, 154–55).

In his discussion of Dr. Seleshi's, and Dr. Lovko's opinions, the ALJ noted:

> The State agency psychological physicians opined that the claimant could understand and remember simple one to two step instructions for routine tasks. The claimant can perform familiar routine tasks without expectation for fast pace, close concentration or meeting stringent production standards. The claimant can engage in superficial interactions with coworkers, supervisors, and the general public but would perform best in solitary duties without over the shoulder supervision. The claimant could adapt tow [sic.] or kina [sic.] stable and flexible setting with predictable expectations and infrequent routine changes. (3A; 4A; 5A; 6A). I find these opinions to be persuasive. They were both supported by and consistent with the record.

(ECF No. 8, PageID #: 78). Again, the ALJ's RFC incorporated Dr. Seleshi's and Dr. Lovko's opinions by limiting Claimant to "simple instructions and work-related decisions, but not at a production rate pace" with occasional interactions with others and occasional changes in a routine work setting. (ECF No. 8, PageID #: 71).

In formulating the RFC, the ALJ articulated how he considered the evidence in the record and formulated the RFC. The ALJ observed Dr. Bard's findings in his psychological consultative examination that "the claimant performed poorly on test batteries that measure recent, delayed recall, concentration, and attention." (*Id.* at PageID #: 79). The ALJ discussed Claimant's mental health treatment notes, which described "claimant's attention as limited and she was easily drawn to unimportant or irrelevant items," but her "judgment and insight were intact" and "claimant's

memory was good." (*Id.* at PageID #: 75). The treatment notes further detailed, "claimant's thought processes were circumstantial," but "[t]he claimant's memory, attention, concentration, and language skills were all intact." (*Id.* at PageID #: 76). However, the ALJ found the record failed to support Claimant's alleged impairments in understanding, memory, concentration, and task persistence as "claimant's treatment notes failed to show evidence of impairments to the claimant's memory and understanding," and "[e]xaminations also found that the claimant's concentration and attention were normal." (*Id.* at PageID #: 79). In further support of this finding, the ALJ noted Claimant's statement in her function report that she was able to follow both spoken and written instructions well her activities of daily living,

> [T]he claimant's activities of daily living demonstrated that her impairments to understanding, memory, concentration, and task persistence were not as limited as alleged. The claimant watched television and listened to music for entertainment. The claimant grew flowers as a means of relaxation. The claimant was able to manage her own funds. The claimant's memory was sufficient to allow her to search for work. The claimant was able to babysit for thirty hours per week.

(*Id.*)

Furthermore, Claimant contends that the ALJ failed to incorporate Dr. Bard's limitation regarding Claimant's preservation with her foot injury into the RFC and this error requires remand. (ECF No. 10, at 16). In response, the Commissioner argues that the ALJ accounted for Dr. Bard's opinion as "the ALJ limited Claimant to only occasional interactions with others [citation omitted], which is a socially limited finding. Thus, the RFC accounts for the limitations in Dr. Bard's opinion." (ECF No. 11, at 8). This Court agrees with the Commissioner as substantial evidence supports the ALJ's evaluation of Dr. Bard's preservation limitation. In formulating the RFC, the ALJ noted Dr. Bard's findings regarding Claimant's perseverative thought processes. The ALJ reasoned that "[d]uring treatment and during the hearing, the claimant exhibited perseverative thought processes focusing on her foot pain and her conviction

18

that her foot pain prevented her from being able to engage in nearly all activities." (ECF No. 8. at PageID #: 80). Despite Claimant's ruminations, the ALJ found her "insight and judgement were fair." (*Id.*) The ALJ also noted that Claimant's activities of daily living did not support her alleged impairment level as "[t]he claimant was able to complete normal daily activities despite her symptoms" including errands, household chores, preparing meals, washing dishes, cleaning, searching for work opportunities, raising flowers for relaxation, and taking care of her grandchild for thirty hours each week. (*Id.*) After considering the record evidence, the ALJ found Claimant's symptoms supported limiting her workplace changes. Therefore, upon consideration of claimant's mental impairments, treatment notes, consultative evaluation findings, medical opinions, and activities of daily living, the ALJ formulated an RFC supported by substantial evidence that limited Claimant to "simple instructions and work-related decisions, but not at a production rate pace" with occasional interactions with others and occasional changes in a routine work setting. (ECF No. 8, PageID #: 71, 80).

Claimant requests this Court to reweigh the evidence as she finds "[t]he limitations opined by the state agency medical consultants as well as the consultative examiner are significantly more restrictive than the limitations included in the ALJ's RFC finding." (ECF No. 10, at 18). Claimant also believes the opinions of the consultative examiner and both state agency medical experts are inconsistent with the ALJ's RFC. (*Id.* at 15). Subsequently, Claimant concedes that "[a] local bridge could be made concerning the limitations opined by the experts and the ALJ's RFC." (ECF No. 10 at 17). However, it is not the role of this Court "to reconsider the facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). Rather, because

substantial evidence supports the Commissioner's decision, the Court must defer to it, "even if there is substantial evidence that would have supported an opposite conclusion." *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.") (citations omitted). Therefore, the ALJ's RFC determination is supported by substantial evidence as the ALJ reasonably explained how he considered Claimant's impairments, the consultative examiner, and both state agency psychologists' opinions, and how he accommodated these symptoms when he formulated Daniels' RFC. Thus, the Court must defer to the ALJ's decision.

Finally, Claimant contends that the one to two step limitation is work preclusive and therefore remand is appropriate. (ECF No. 12 at 2). This contention is unavailing. For even if the ALJ had erred in failing to include or explain away the one and two step limitation, that error would have been harmless. The Commissioner correctly notes that "the jobs identified by the vocational expert either have a reasoning level of 1 or 2 and 'caselaw supports that [the] recommended limitation—simple one-to-two step tasks—is consistent with level two reasoning jobs.'" (ECF No. 11, at 7–8) (citing *Huizar v. Comm'r of Soc. Sec.*, 610 F. Supp. 3d 1010, 1016–17 (E.D. Mich. 2022)); *see also Kerr v. Comm'r of Soc. Sec.*, No. 2:13-CV-457, 2014 WL 4243771, at *4 (S.D. Ohio Aug. 26, 2014) ("governing authority reflects that the RFC limitation of 'one or two-step instructions' is not work preclusive, and, in fact, corresponds with jobs classified at DOT Reasoning Development Level Two") (collecting cases).

At the hearing, the VE testified that an individual with Daniels' vocational background and limitations consistent with the RFC would be able to perform the requirements of representative

occupations such as (1) cleaner, DOT 323.687-010 with 40,000 jobs nationally, (2) price marker, DOT 209.587-034 with 60,000 jobs nationally, (3) laundry worker, DOT 302.685-010 with 45,000 jobs nationally. (ECF No. 8, PageID #: 81, 118). Each of representative occupations is classified at DOT Reasoning Development Level One or Two and there are a significant number of these occupations in the national economy. (*Id.* at PageID #: 118); *see Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016) (finding 6,000 jobs nationwide established a significant number of available jobs) (citing *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 579 (6th Cir. 2009)) (finding 2,000 jobs in the national economy constituted a significant number). Thus, even if the ALJ had erred in failing to include or explain the one and two step task limitation, that error would have been harmless because there was still substantial evidence based on the record and the vocational expert's testimony to support the jobs identified by the ALJ at step five.

**VI. Conclusion**

Based on the foregoing, the Court overrules Claimant's Statement of Errors and affirms the Commissioner's decision.

Dated: June 18, 2026

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

21